Filed 3/21/23 P. v. Ji CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SANG LIM JI,<br><br>    Defendant and Appellant. | H048205<br>(San Benito County<br>Super. Ct. No. CR-17-01828) |

## I.    INTRODUCTION

On November 28, 2017, Yoon Hee Ji, defendant's wife of more than two decades and mother to two daughters, died in the couple's home. Yoon's[1] death came as the result of head injuries caused by blunt trauma suffered from repeated blows by an object. Besides Yoon, two people were home at the time of the killing: defendant and a woman named Jung Choi. Defendant and Choi had previously engaged in a sexual relationship, though defendant described Choi to others as his cousin. When Yoon could not be reached over the next few days after her death, her elder daughter contacted the San Benito County Sheriff's Office. During the ensuing investigation, defendant provided conflicting and unconvincing accounts of Yoon's whereabouts and his relationship with Choi, leading investigators to focus on him and Choi as suspects. Following a search of

---

[1] We refer to defendant's wife by her first name to avoid confusion.

defendant's home, both defendant and Choi were arrested. Two weeks after his arrest, defendant directed sheriff's officials to Yoon's body, which was buried in a shallow grave in a remote area.

A jury convicted defendant of first degree murder (Pen. Code, § 189, subd. (a)).[2] The trial court sentenced defendant to 25 years to life in prison.

Defendant first contends that the finding that he killed Yoon in a willful, deliberate, and premeditated manner is not supported by substantial evidence. He next alleges that he received ineffective assistance of counsel through several actions or inactions by trial counsel: counsel's failure to file a motion for acquittal following the prosecution's case-in-chief; representations made during his counsel's opening statement and closing argument; counsel's adducing of evidence in the defense's case that defendant alleges was unfavorable; and counsel's lack of objection to evidence of condoms that demonstrated sexual activity between defendant and Choi. Defendant also asserts that the trial court improperly instructed the jury on an invalid legal theory of murder. Finally, defendant contends that the cumulative effect of defense counsel's multiple errors deprived him of a fair trial.

For reasons that we will explain, we affirm the judgment.[3]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Prosecution Case*

#### 1.    Background

Defendant and his wife Yoon lived in a house in Hollister. Defendant worked as an electrical engineer for a San Jose company, while Yoon operated the couple's laundromat business in Hollister. The couple's two daughters were both in their twenties

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Defendant's appellate counsel has filed a petition for writ of habeas corpus that this court ordered considered with the appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

and lived in Southern California. Defendant and Yoon experienced difficulties in their marriage. Defendant later characterized his marriage as follows: "[W]e are not really [a] good husband and wife." The couple's eldest daughter saw defendant hit Yoon during the marriage.

One source of contention occurred in April 2017, when Choi came from South Korea to visit defendant in the Hollister home, along with a man defendant described as Choi's father. Defendant's daughters, who talked often with Yoon, suspected defendant and Choi were having an affair. Yoon told her elder daughter that the couple experienced marital problems arising out of the April 2017 visit by Choi. Yoon also later told the elder daughter that defendant and Choi were "kind of like emotionally abusing her" during the April 2017 visit, that defendant was "verbally and physically abusive" to Yoon during the visit, and that Yoon and Choi got into a physical confrontation during the visit. During the visit, Yoon called 911, requesting assistance in removing Choi and the man who accompanied her from the house. During this same visit, defendant, Choi, and the male accompanying Choi traveled on the 17-Mile Drive in Monterey County. Two pictures introduced at trial showed Choi and defendant kissing during this trip, though defendant stated the kissing was intended to instruct his wife how to treat him, not to express affection for Choi. Defendant's eldest daughter became aware of the photos and confronted defendant about them; defendant responded that Choi was merely his cousin.

In May 2017, Yoon contacted an attorney to explore divorcing defendant. Defendant later admitted to police that he was aware Yoon had interest in divorcing him and that she had contacted a divorce lawyer. However, defendant stated that as a Catholic, he was not permitted to divorce, and he considered divorce to represent a "failure," though he told police that he had expressed some interest in divorce as well.

On November 28, 2017, defendant picked up Choi at the San Francisco airport as Choi came to visit defendant again. Yoon did not indicate to her daughter that she was aware Choi would be visiting. Yoon opened and closed the laundromat as usual on that

3

day. She also followed her normal habit of working out at a local fitness facility after work. Yoon arrived home later that evening and saw Choi and defendant in the home. Yoon did not report to the laundromat the next morning, and no one apart from defendant reported seeing her alive after that evening.

### 2. The Missing Person's Report

Yoon was close to her two daughters, and they normally talked over the phone on a nearly daily basis. The elder daughter last talked to Yoon on the evening of November 28, 2017 at around 6:30 p.m., as Yoon was getting ready to leave the laundromat. In the ensuing days, the elder daughter attempted to reach her mother, getting Yoon's voicemail each time. The elder daughter was concerned because Yoon "usually always answered" the phone.

On December 1, 2017, the third day after Yoon was last seen at the laundromat or last talked to her daughters, defendant sent a text message to his two daughters, stating that Yoon had traveled to South Korea to take care of Yoon's mother and that Yoon's phone was broken, so she could not be contacted. The elder daughter had difficulty believing that Yoon would leave the country without telling her daughters, and that she would do so without her phone, as the phone was important in operating the laundromat. Defendant followed up with another text to his daughters, telling them that he was taking an extended leave of absence from his work to run the laundromat in Yoon's absence and that he would have family members visiting him through the winter.

The two daughters were skeptical about defendant's claims regarding Yoon's whereabouts. The younger daughter reached out to members of the family in South Korea, who stated that Yoon was not with them and that Yoon's mother was in good health. As result, the elder daughter decided to drive from her Los Angeles residence to Hollister on December 2, 2017, even though she had just been to the family home recently for Thanksgiving. When the elder daughter arrived at the home, she noticed that a portion of the carpet in the kitchen had been removed since the Thanksgiving visit. The

4

daughter asked defendant why the carpet was removed, and defendant replied that water damage had occurred. The daughter asked defendant where Yoon was, and defendant replied that Yoon had gone to South Korea. The daughter described defendant's reaction as "very upset," and she perceived that defendant was not elaborating in his answers. Defendant also told his daughter that he and Choi were on their way to a Christmas party for defendant's employer.

The elder daughter responded by filing a missing person's report with the San Benito County Sheriff's Office that same day, December 2, 2017. She also returned to the house later that evening after filing the report. When the daughter returned, she noticed that the mattress from her room had been moved to the office room. The mattress had been in the daughter's room earlier that day.

### 3. Sheriff's Investigation – Initial Steps

Upon receiving the daughter's report, Sheriff's Deputies Russell Brown and William Hutchison responded to defendant's home. The deputies found defendant and Choi in the house, and they questioned defendant about Yoon's whereabouts. Brown and Hutchison noted that defendant's hands were shaking during this conversation.

Defendant told the deputies that Yoon was absent because she flew to South Korea at some point in recent days to take care of Yoon's sick mother. However, defendant was unable to state when Yoon left, how she got to the airport, what airline she flew on, or even what airport she flew out of. Defendant stated that he did not know how long he expected Yoon to be gone, but he thought her absence could last "[m]aybe two months or three months."

Defendant also told the deputies that Yoon's cell phone had recently been broken when it was "smashed or dropped," and that defendant had been unable to repair the phone so he threw it away. Brown asked defendant why Yoon would not tell her daughters that she was going to South Korea for such a long period, and defendant replied, "I don't want to say, but if [Yoon is] not going to Korea, that's going to be a very

5

sad story." When asked to clarify, defendant stated that Yoon had disabled the GPS tracking device on her phone, leading defendant to believe she may be "doing some cheating or something like that." Defendant stated that he "wish[ed]" that Yoon was safe, but he speculated that instead of caring for her mother, Yoon might either be having an affair or have been attacked when transporting cash out of the laundromat business. Defendant stated that the laundromat's net proceeds were usually around $9,000 or $10,000 per month. Defendant stated that beginning on November 29, 2017, he opened and closed the laundromat because Yoon had expressed that she was tired of doing so. Defendant told the deputies that he was about to start an unpaid leave of absence from his electrical engineer's job so that he could run the laundromat, and that he had submitted the leave request "two to three weeks" prior to the December 2, 2017 interview.

Brown also asked defendant about the nature of his relationship with Choi. Defendant stated that Choi was his cousin, and he repeatedly denied having any sort of romantic or sexual relationship with Choi. When pressed, however, defendant stated that he and Choi had been photographed kissing during Choi's April 2017 visit. Defendant stated that he took the pictures to show his wife how to be "more kind" to him and how to be a better wife.

Defendant also outlined some issues with his marriage to Yoon, including that both had contemplated divorce, although defendant stated he was opposed to divorce. Defendant stated that he and Yoon had argued on November 27, 2017, over the breakfast that Yoon had prepared for defendant. Defendant also stated that he and Yoon planned to buy a house in South Korea, but they disagreed on what type of house to buy. Defendant stated that without Yoon's knowledge, he wired $150,000 for the purchase of a house in South Korea, and that Yoon was "not happy" about this, leading to arguments.

The deputies walked through defendant's house with him during the visit to the home. Defendant was unable to identify any missing suitcases or clothes that would support defendant's position that Yoon had traveled to South Korea. The deputies also

6

noted the mattress and a computer in the home's office room; defendant stated that Choi was staying in that room.

Later that evening, Detective Sergeant Thomas Keylon, Jr., spoke with defendant at the laundromat. Defendant stated that he thought Yoon had taken a trip to South Korea, that he and Yoon were experiencing marital difficulties, and that defendant feared Yoon may be seeing somebody else. Defendant confirmed that Yoon ran the day-to-day operations of the laundromat, including opening and closing it. Defendant stated that Yoon had grown tired of running the laundromat and wanted to go visit family in South Korea, and therefore defendant took a leave of absence from his job to run the laundromat so Yoon could travel to South Korea.

In this second interview during the evening, defendant stated that he had picked up Choi at the San Francisco airport on November 28, 2017. Defendant stated that when he and Choi arrived home, Yoon was "not happy," though Yoon did not say anything about the situation at that time. Defendant also told Keylon that Yoon's phone was not working at the time, that defendant had tried unsuccessfully to repair the phone, and that defendant placed the phone on the counter and he thought Yoon must have thrown the phone away. This contrasted with defendant's earlier statements to deputies that defendant (not Yoon) had disposed of the phone. Defendant stated that his daughters were not happy that defendant had sent a large amount of money to South Korea, and that this caused a rift between defendant and his daughters. Keylon asked defendant why he had not reported Yoon missing, and Keylon characterized defendant's response as "evasive," not answering the question. Defendant stated that Choi was his cousin who was in the area looking for a university for her daughter to attend, and defendant denied any intimate relationship with Choi. Defendant stated that the last time he saw Yoon was the previous day, December 1, 2017.

Keylon also walked through the house that evening. The elder daughter, who had returned to the home by this point, accessed the computer in the home's office and

7

searched the computer's internet browser history with Keylon. They found that someone had searched for an airline ticket to South Korea. According to a printout of the browser history, these searches were conducted on the afternoon of November 29, 2017. With that, Keylon left defendant's residence and issued a notice to be on the lookout for Yoon.

### 4.    Sheriff's Investigation – Subsequent Steps

The following day, Keylon took additional investigative steps, including visiting the fitness facility Yoon frequented. The fitness facility reported that Yoon last checked in at the facility on November 28, 2017, at 7:23 p.m. In addition, Hutchison met with defendant and Choi on December 4, 2017 to return a cell phone that defendant had permitted sheriff's officials to search. During the brief encounter, defendant did not ask if any progress had been made in locating Yoon. About 15 minutes later, defendant returned to the sheriff's office, this time with Choi. During this interaction, Choi relayed concerns about pictures sheriff's officials had taken of her personal belongings, and she asked why her cell phone had been taken.[4] During this session, Choi "was so nervous when [Hutchison] gave her a glass of water she was missing her mouth and spilling it on her clothes."

On December 6, 2017, law enforcement officials executed a search of defendant's home pursuant to a warrant. Upon entering the home, Keylon saw Choi standing in the kitchen wearing an apron and rubber gloves and using bleach while cleaning the area of the kitchen island. The smell of bleach was strong enough that it "kind of overcame" Keylon. During the search, law enforcement officials seized several items, including a metal trough in the backyard that appeared to have burn marks along with a nearby metal rod and wooden handle, a pair of glasses retrieved from a trash can, an empty bleach container, a pillow with stains that was located in a vehicle, swabs from several areas in

---

[4] Deputies took two white phones from the home because Yoon's daughter had stated that Yoon's phone was white. The daughter was unable to identify either phone as her mother's, so Hutchison returned the phones.

8

the house, and DNA samples from defendant and Choi. The trough's sides were marked with apparent ash residue, "as if somebody had burned something in it," and apparent ash and blackened areas appeared in a small hole in the ground near the trough. Nonetheless, the trough appeared to have been well cleaned.

Human remains detection dogs were also called to the home for the search. The dogs, which were trained and certified to only alert upon finding remains of deceased persons, alerted in the area of the backyard trough, a green Ford Explorer, a beige Ford Explorer, and a garbage can. The dogs did not alert inside the house, though one dog handler noted that the carpet smelled of bleach "strong enough to where it would burn your eyes."

Defendant and Choi were detained outside the house during the search. While the search was being conducted, Choi had "an episode" and requested medication. Keylon found medication in Choi's name on the nightstand in defendant's master bedroom, and he brought it to Choi. Later, defendant and Choi were placed in a sheriff's car to be brought in. While the two sat in back of the car, Choi made statements to defendant instructing him to remain quiet. Defendant and Choi were arrested later that day.

On December 20, 2017, law enforcement officers found Yoon's body partially uncovered in a shallow grave, located in a dropoff by a remote road in the county. Investigators found the body after defendant directed them to the body's location. A rolled-up section of carpet was located on the side of the road near where Yoon's body was discovered, leading investigators to believe this was the piece of carpet removed from defendant's house. The carpet had several dark stains on it.

Keylon returned to defendant's house two more times following the discovery of Yoon's body. On March 7, 2018, Keylon returned to the house and saw that all of the kitchen carpeting had been replaced with laminate flooring, and that construction debris (including rolled-up carpet) was piled in the driveway. Law enforcement officials collected samples of the carpet, which included dark stains, and sent it for DNA analysis.

9

On March 13, 2018, Keylon returned to the home again and seized a plastic baggy that contained two used condoms and condom wrappers from the freezer section of the home's garage refrigerator. Keylon also sent this evidence for DNA analysis.

### 5. Additional Evidence

A laundromat employee who normally worked with Yoon at the laundromat saw very little of defendant before Yoon was reported missing. The laundromat employee last worked with Yoon on November 27, 2017. The employee had the day off on November 28, 2017, and then defendant showed up to work at the laundromat on November 29, 2017.

A regular customer of the laundromat called Yoon sometime mid-day on November 28, 2017, to request help because his money had stuck in a laundry machine. Yoon came to the laundromat, assisted the customer, and left.

On the afternoon of December 2, 2017, the son of the couple that lived across the street from defendant was helping his parents move to another house. While the son was there, he saw defendant "roll out a blue recycle can with a big branch sticking out of it" onto the curb. The neighbors' son later observed "some smoke billowing out" from the can, with the smoke growing worse. After the son's mother attempted unsuccessfully to notify defendant, the son took it upon himself to kick over the can and spread the contents out to put out the smoke. At that point, defendant "came running out frantically" in a way that struck the neighbors' son as "odd," telling the neighbors' son, "Get away from it. I got it. I'll clean it up." At the time, defendant was wearing a bathrobe and his hair appeared wet, causing the neighbors' son to believe defendant had just come out from the shower. The neighbors' son stated it was "very strange to me that [defendant] came out so fast," and that defendant "was definitely addressing me, not the issue." The neighbors' son then returned to his parents' house.

### 6. Forensic Evidence

#### a. Cell Phone Records

A crime and intelligence analyst with the sheriff's office analyzed cell phone records concerning defendant, Yoon, and Choi. Choi's phone was activated on December 1, 2017. Defendant's and Yoon's records showed that the two were in regular contact between November 1 and November 28, 2017. Cell phone records also indicated that defendant received a call from an unknown number while defendant was in the vicinity of the San Francisco International Airport at 12:46 p.m. on November 28, 2017. Defendant's cell phone records indicated that he made two calls to Yoon's number between 11:00 and 11:14 p.m., but neither appeared to connect. The records indicated that defendant's phone was in the vicinity of Hollister when these calls were placed.

Yoon received a call at 6:32 p.m. on November 28, 2017, that placed her location in the vicinity of the laundromat. This was consistent with Yoon's elder daughter's testimony that the two talked at about that time while Yoon was preparing to leave the laundromat. Yoon's phone received two more incoming calls that evening from a number that was not identified as belonging to any particular person, one at 10:43 p.m. and one at 10:44 p.m. The calls lasted one second and three seconds, respectively, indicating that Yoon did not answer the calls. Defendant's cell phone records also indicated that Yoon's phone placed a third call to defendant's phone at 11:16 p.m. that connected for four seconds; Yoon's cell phone records did not contain a record of this call. Yoon's phone records also indicated that her elder daughter called Yoon twice on November 29, 2017 and twice on November 30, 2017, with none of the calls connecting.

#### b. DNA

A senior criminalist with the California Department of Justice, Bureau of Forensic Services received DNA reference samples for defendant, Yoon, and Choi, and she tested several items seized from defendant's house for DNA. The eyeglasses taken from a trashcan at defendant's house revealed a presumptive test for blood on them, with DNA

11

matching defendant's profile on the nose piece of the glasses and DNA consistent with Yoon's profile on the outer part of the glasses. DNA from an apparent blood stain on the pillow taken from a vehicle matched Yoon's profile. A swab from the base of the kitchen island matched Yoon's profile, as did an apparent blood stain taken from carpet cuttings. The criminalist also analyzed the two condoms taken from the house. DNA on the condoms matched both defendant and Choi's profiles. Yoon was excluded as a source of DNA on the condoms.

### c.      Computer

A senior forensic analyst from the Northern California Regional Intelligence Center examined the computer taken from defendant's house. The analyst observed that the computer had been "wiped and reinstalled" on December 4, 2017, at 10:39 p.m., meaning that the Windows operating system was reinstalled and the hard drive was reformatted. As a result, the analyst was unable to obtain any information about the computer's use prior to December 4, 2017.

### d.      Forensic Pathology Report

The chief medical examiner and neuropathologist for Santa Clara County testified about the autopsy she conducted of Yoon's body. The examiner identified Yoon's body using specialized fingerprint analysis, because the body was too decomposed to rely on visual identification or standard fingerprinting.

Generally, the examiner observed 29 injuries to Yoon's body, all inflicted before her death. These injuries included the following: several bruises, including a particularly large bruise on the left side of Yoon's face as well as bruising or discoloration on Yoon's arms that indicated injuries sustained while attempting to defend herself; lacerations representing blunt force trauma; several rib fractures; a broken jaw; a "massive" hemorrhage in the left frontal area of Yoon's head; and three skull fractures including one depressed skull fracture that involved "significant force." One of the injuries left a "U-shaped, horseshoe-shaped" bruise that indicated that a weapon was used, "something

12

longer and cylindrical, such as a pole or a bat." Overall, the examiner identified at least nine impact injuries that caused the 29 injuries.

The examiner determined that the manner of Yoon's death was homicide, and the cause of Yoon's death was cranial cerebral injuries due to blunt head trauma. The examiner also concluded that Yoon died of her head injuries within "minutes." The examiner saw no other health issues that would have caused Yoon's death, and concluded that Yoon was "relatively healthy" before sustaining her fatal injuries.

## B. *Defense Case*

### 1. Opening Statement

The defense's opening statement did not dispute that Yoon was killed in the home; instead, the defense highlighted that it would focus on Choi's role in the killing. The defense told the jury as follows: "So what are you guys going to see when you find out this case? You're going to see -- and I'm -- I'm more than confident when this case is over, you're going to find unequivocally, without a doubt, that Jung Choi will admit that she killed his wife. [¶] She's going to come to the stand, and I'm going to ask her, 'Did you kill his wife?' And she's going to say yes." After discussing the elements the prosecution would need to prove for first degree murder, the defense told the jury: "But you're going to find that Jung Choi, the girlfriend, has already -- will admit -- she will admit that she killed Mrs. Ji in the heat of passion, in a sudden quarrel. I'm confident that you will see that, you'll hear it, and there will be no doubt that that's what happened." Later, defense counsel returned to Choi's role again, telling the jury: "We're looking for, is there evidence that [defendant] did the killing? Or do we have clear, convincing and unequivocal evidence that Jung Choi, the girlfriend, did the killing. I'm certain that that's what the evidence will say."

13

### 2.    Choi's Testimony

The defense called two witnesses, the first being Choi.[5]  Several weeks before defendant's trial, Choi pleaded no contest to one count of a violation of section 192, subdivision (a) (voluntary manslaughter) in connection with Yoon's death.  Choi first testified that she visited California in April 2017, and that defendant's mother and Choi's mother are sisters (making Choi defendant's cousin).  Choi then testified that she was not friends with defendant, but that they were merely relatives.  Defense counsel alluded to the evidence of condoms in defendant's house, and Choi testified that their relationship was not a loving one or a relationship between friends, but that she and defendant drank alcohol and made a "mistake."  Choi stated that she believed this "mistake" occurred only one time, about one or two days before she returned to South Korea from her April 2017 visit.

Defense counsel then questioned Choi about a small metal bat in the home, asking about a time when Captain Eric Taylor of the sheriff's office had questioned Choi why her DNA would be on the bat.  Choi stated that she remembered telling Taylor that she used the bat to clean cobwebs from the ceiling in defendant's home.

As questioning about Choi's DNA came to a close, defense counsel and Choi engaged in the following exchange:

"[Defense counsel:]  Okay.  But you do admit that you did kill Yoon Ji, don't you?

"[Choi:]  No.

"[Defense counsel:]  No?

"[Choi:]  I did not kill her.

"[Defense counsel:]  Did you plead no contest to the killing of Yoon Ji in open court?

"[Choi:]  What does that mean?

---

[5] Choi testified through an interpreter.  Choi's attorney was present when she testified.

14

"[Defense counsel:] Do you remember being asked -- then asked, to Count 2 in the Complaint filed on December 8, 2017 -- 'Count 2 being charged as Penal Code Section 192(a), a felony violation of Penal Code, date of incident, November 28th, 2017; victim, Yoon Hee Ji; voluntary manslaughter.

" 'To that charge, what is your plea?'

"And your answer: 'No contest pursuant to *People versus West*'?

"[Choi:] No, I was not admitting that I killed Ms. Ji. I was only trying to not receive any additional sentencing. I felt that there was a possibility of me having some responsibility of Mrs. Ji's death, so that is why I was accepting that.

"I did not admit that I killed her. So what I did at the time was the *West* plea."

At that point, defense counsel turned to other matters in Choi's direct examination. Choi admitted to going grocery shopping days after Yoon's death using a credit card that turned out to be Yoon's. Choi denied knowing that it was Yoon's card, but she did state that she knew Yoon was dead at the time she went shopping. Choi then testified that she saw Yoon during Choi's April 2017 visit, but that Choi never saw Yoon alive on November 28, 2017. Choi testified, "So when I saw Ms. Yoon Ji, she was already on the floor when I discovered it." Choi testified that she saw both a long gun and a bat near Yoon's body.

After further testimony about Choi's trip to the grocery store, defense counsel asked Choi why she was cleaning the kitchen area with bleach when law enforcement executed the search warrant on December 6, 2017. Choi replied that she was cleaning because of a "strong smell" caused by draining water, and she stated that defendant told her that he cut out a portion of the carpet to find out how much water was leaking to the floor. Choi stated that the removed carpet was not in the exact location where she found Yoon's body, but it was nearby.

Choi then testified that before discovering Yoon, Choi was preparing for bed when she heard Yoon enter. Choi testified that she then heard an argument between Yoon and

15

defendant that occurred around 11:00 p.m. or midnight. She characterized the argument as "[n]ot very loud," alternating between loud and soft. After discussing the timeline of her travels earlier that day, Choi then testified that she "had no problem with [Yoon] whatsoever," and that Choi did not believe herself responsible for the 911 calls in April. She denied being involved in a heated argument with Yoon in April, and she characterized the incident as an argument between Yoon and defendant. Choi stated that she told the law enforcement official responding to the 911 calls that she was "kind of scared" about the situation because Yoon "was telling me to go outside, get out." Choi testified that she did not anticipate any problems with Yoon upon Choi's return in November 2017. Choi testified that upon arriving at defendant's house in November, she cleaned the office room and moved a mattress from another room to the office room, where she intended to sleep as she had done in her April visit.

Choi testified that after seeing Yoon on the floor on the night of November 28, 2017, she was "so shocked" and told defendant to contact emergency services or take Yoon to the emergency room. However, Choi testified that defendant responded that it was already too late to do so, and that defendant asked Choi to help him. Choi testified that defendant told her, "it will be all over if this gets reported to the police," that Choi should not worry because defendant would select a good attorney, and that Choi should just help him. Choi testified that she obtained towels to clean up the bleeding around Yoon's head and on the carpet, and that she placed the towels in a plastic bag. Choi testified, "And the bat, I washed that from water. And where this was initially located, this was a storage bin area right next to the kitchen. That's the place where [defendant] initially took that out from. [¶] So then that was placed back there." Choi testified that she then wrapped Yoon's body in a comforter. Defense counsel then confronted Choi about why she did not tell law enforcement that she knew Yoon was killed. Choi responded that she was following defendant's instructions not to tell anyone about the killing. With that, Choi's direct examination ended.

16

On cross-examination, Choi testified that she had received no promises in exchange for her testimony, and she stated that defendant was her cousin. After briefly discussing a rifle in defendant's home, Choi testified about the pictures of her kissing defendant in April 2017, stating that she and defendant were "basically, like, playing around" and Choi did not kiss defendant because of "any affection or loving relationship" but instead to "stimulate" Yoon to treat defendant better. However, Choi testified that she did exchange text messages and phone calls with defendant after the April 2017 visit, and defendant invited Choi to spend Christmas with him. Choi also stated that she talked with defendant before the April 2017 visit about defendant's marriage, and that defendant told Choi and other family members that "his marriage life was not going well, and that he had a lot of frustrations about his marriage." Choi also testified about defendant's reaction to Yoon's death, stating that defendant threatened Choi with a gun, defendant directed Choi to bring something to wrap the body in, defendant brought a beige sport utility vehicle to the backyard and Yoon's body was loaded into it, and defendant "threatened" Choi and told Choi to help him, so Choi "was kind of scared and in fear." Choi stated that after defendant found Yoon's cell phone on Yoon's body with the phone's screen broken, defendant took the phone to the garage and drove over it. Choi testified that she did not search the internet on defendant's computer for an airline ticket back to South Korea. Finally, Choi testified that she had discussed the meaning of her no contest plea with her attorney.

On redirect examination, defense counsel first focused on casting doubt about Choi's statements on cross-examination that she feared defendant. Defense counsel asked Choi whether she made the following statements to defendant while they were seated together in the back of the patrol vehicle during the December 6, 2017 search: "We have nothing to do with this. Be quiet. Listen to me. I know everything. Why would we kill her? We have no reason to. The cleaning of the molding is the only fault I

17

have. Remember not to speak too much."[6] Choi replied that she did not remember saying this, but if she did, she was merely repeating what defendant had told her. Defense counsel also asked Choi why she did not tell sheriff's officials she was afraid of defendant; Choi responded that she was "very confused" at the time.

Defense counsel then returned to Choi's account of the sexual intercourse between her and defendant. Choi testified that the intercourse took place before the 911 calls in April, and she characterized the activity this way: "Rather than expressing as having sexual intercourse, it being more correct to say a sexual intercourse where I did not want to have." Choi also characterized the intercourse as "forced." Defense counsel then asked whether, in light of the two condoms found in defendant's house, both incidents were non-consensual. Choi did not directly answer the question, instead discussing the fact that she and her father were making plans to leave California when the intercourse occurred.

Choi then testified in redirect about defendant's elder daughter's arrival at the house on December 2, 2017. Choi testified that she heard the daughter arguing with defendant, and Choi stated that ever since the killing, she experienced fear and discomfort, not being able to eat or sleep properly. Defense counsel asked Choi, "Isn't that because you killed [Yoon] with a bat?" Choi replied negatively, but she stated that she was "regretful" and "shameful" because she feared "I have committed this crime together [with defendant]" and because defendant told Choi she was an accomplice to the crime.

Defense counsel asked Choi whether she felt any emotional grief or sadness about the killing, and Choi replied that she "was feeling disturbed all along." Defense counsel replied, "You have been saying you've been disturbed. But I haven't heard a sound of

---

[6] The conversation between defendant and Choi took place primarily in the Korean language. The prosecution introduced a recording of the conversation, but the record indicates that an English translation of the conversation was not introduced into evidence.

18

sadness or grief coming out of you." Choi replied by relaying a discussion with an attorney at the South Korean Consulate General's Office about whether Choi was permitted to return to South Korea. Choi continued: "So I told Mr. Ji that the -- because I'm too scared and afraid, that I want to return and go back. And then he said, 'If you do leave and go, then you will be accepted being more suspicious, that you should not leave. And then if you do leave, that I'm going to go and tell the police that this all occurred and done by you.' [¶] So he was preventing me from leaving." Defense counsel pressed further, asking Choi, "Do you believe that Yoon Ji deserved to die?" Choi replied, "I don't know the exact matter between the two, so I cannot say anything. But another human being killing someone else, that's a very serious crime." With that, Choi's testimony concluded.

### 3. Captain Taylor's Testimony

Captain Taylor, the operations captain for the sheriff's office and the lead investigator for this case, testified briefly in the prosecution's case-in-chief about the recording system in patrol cars and the fact that he placed defendant and Choi in a patrol car during execution of the December 6, 2017 search warrant. The defense then called Taylor to testify again during the defense's case to provide additional details about some matters covered in the prosecution's case. Taylor testified that he originally identified two suspects in Yoon's death, defendant and Choi. He testified about Choi's activities as execution of the warrant began, including that she was standing near the area where Yoon was presumed to have died and that Choi was holding a bottle of bleach. Taylor testified that he told Choi while Choi was in jail that there may be a chance to find DNA on the bat that was considered a possible murder weapon. Taylor stated that Choi explained that her DNA may be on the bat because she was cleaning cobwebs with it. Taylor testified that at the time he questioned Choi in the jail, he considered Choi to be a homicide suspect.

19

Defense counsel then asked Taylor about a December 20, 2017 discussion Taylor had with defendant at the county jail. After confirming that the discussion took place, defense counsel asked, "And after the interview, did you go to the place where the body of Yoon Ji was located?" Taylor replied affirmatively. Defense counsel attempted to ask Taylor whether going to the site of Yoon's body was "the product" of the discussion with defendant, but the court sustained an objection to this question. Taylor did testify that "[t]here was a sequence of events that led up to" finding Yoon's body, but he did not further elaborate on this. Defense counsel then asked Taylor about evidence that was not gathered from defendant's home that could have shown whether defendant's vehicles went to the location of the body. Defense counsel then followed up with questions about Choi's episode on December 6, 2017 where she required medication, along with the lack of any DNA or fingerprint evidence recovered from the metal pole and wooden object found in defendant's backyard. The prosecutor did not cross examine Taylor, and the defense rested. Defendant did not testify.

### 4. Closing Argument

Defense counsel began his closing argument by focusing again on Choi's role in the killing, arguing as follows: "I told you at the beginning of the jury trial in opening statement, that I promise you, and it's not a guess. It's not a possibility. I promise you, and I'm confident, that at the end of this trial you'll know that Jung Choi will admit, and has admitted, to killing Yoon Ji. So I fulfilled that promise. [¶] And I didn't know, of course -- nobody knows what she's going to say when she gets on the stand. But I was confident, because we have a record, a transcript, of her actual plea of 192 of the Penal Code, 192(a), killing in the heat of passion in a sudden quarrel. [¶] There's no question about that. You guys have heard it. But then she says, 'Well, I did it because I was looking at first-degree murder, and I didn't want to go down for first-degree murder, so I took a plea of *People versus West*. But I'm going to prison now because I didn't want to go to prison for first-degree murder.' "

20

Defense counsel returned several times in his closing argument to Choi's role and her testimony. He asserted that the murder weapon was the small bat inside the house that Choi admitted touching, that the forensic pathology evidence was consistent with the bat being the murder weapon, and that Choi's statement about using the bat to clean cobwebs was clearly false. Defense counsel referred to other evidence that he asserted implicated Choi in the killing, such as her cleaning the area with bleach, her statements to defendant in the patrol car, and her responses to defense counsel's questions about whether she felt sympathy for Yoon, which defense counsel argued were "insulting," "equivocal," "indifferent," and "something that had nothing to do with what a real human being would say." Defense counsel noted the evidence of the condoms and the DNA associated with the condoms, asserting that defendant and Choi had a sexual relationship that Choi was now attempting to downplay. Defense counsel argued that Choi was a "liar" and that the evidence pointed to her as "the real killer."

Defense counsel then returned to the subject of Choi's no contest plea to a voluntary manslaughter charge. He argued that voluntary manslaughter is defined in section 192, subdivision (a) as a killing " 'upon a sudden quarrel [or] in the heat of passion,' " and that if Choi had killed Yoon in a sudden quarrel or in the heat of passion, then defendant could not have killed Yoon. He likewise argued that if anyone had an intent to kill Yoon, it was Choi, not defendant, given the fact that Choi returned to visit defendant after having previously engaged in a sexual relationship with him. Defense counsel again stated, "Now, I'm confident, as I said before, that Ms. Choi killed Yoon Ji. I'm 100 percent confident. So is she. That's why she's going to prison. That's why she admitted it." Defense counsel then observed several aspects of Choi's testimony that he asserted were not credible, including her claimed use of the bat to clean cobwebs and her lack of any statement to law enforcement verifying her claim that she was afraid of defendant. After some concluding comments including again stating that Choi agreed to

21

plead no contest to voluntary manslaughter for Yoon's death, defense counsel concluded his argument.

## C.    *Instructions, Verdict, and Sentence*

Defendant was charged with one count of willful, deliberate, and premeditated murder. (§ 187, subd. (a).) Following the conclusion of evidence, the trial court instructed the jury on the elements of first degree and second degree murder, along with the lesser included offenses of voluntary and involuntary manslaughter. The parties and the trial court had discussed instructions at various points, including the issue of whether the jury should be instructed that it could find defendant guilty of murder for failing to comply with a duty to defend his spouse. Defense counsel opposed such an instruction, stating, "I don't actually think there's a duty to defend his spouse in the law." The prosecutor responded that a duty to defend theory could support a conviction for second degree murder, but not first degree murder. The trial court responded that it would not instruct that defendant had a duty to "defend" his spouse, but that defendant did have a duty "[t]o help and care for [his] spouse."

As a result, the trial court instructed the jury as follows, using a modified version of CALCRIM No. 520: "The defendant is charged with murder in violation of Penal Code Section 187. To prove that the defendant is guilty of this crime, the People must prove that the defendant committed an act that caused the death of another person; or, the defendant had a legal duty to help care for his -- in this case -- his spouse, and the defendant failed to perform that duty, and that failure caused the death of his spouse. When the defendant acted or failed to act, he had a state of mind called malice aforethought." After providing further instructions concerning malice aforethought and causation of death, the court instructed the jury: "One spouse has a legal duty to help and care for his other spouse." The court then further instructed the jury on the requirements for finding first degree or second degree murder, using CALCRIM No. 521, before instructing the jury on both voluntary manslaughter and involuntary manslaughter. In

22

instructing the jury on involuntary manslaughter, the court stated that involuntary manslaughter is based on the failure to perform a legal duty, and told the jury: "A spouse has a legal duty to care for the other spouse."

During deliberations, the jury raised two questions. One concerned the spelling of defendant's name. The other requested clarification of second degree murder versus first degree murder. The trial court responded to the latter question by re-reading the CALCRIM No. 520 instruction, and then it again provided the elements for first degree murder, including the requirement that the prosecution demonstrate that defendant acted willfully, deliberately, and with premeditation. The court asked the jury whether this explanation satisfied the question, and a juror responded as follows: "I think the question was, there really isn't a definition except it's a fallback definition. If -- if you have a definition of first-degree murder, is anything other than first-degree murder, second-degree murder if it doesn't fit the qualifications as a lesser charge?" The trial court responded by stating that murder is defined in CALCRIM No. 520, while CALCRIM No. 521 provided the difference between first and second degree murder. The juror responded that the jury was satisfied with the explanation.

The jury found defendant guilty of first degree murder. The trial court then sentenced defendant to 25 years to life in prison and imposed various fines and fees. This appeal timely followed.

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

#### 1. Legal Principles and Standard of Review

Defendant contends that the evidence at trial was insufficient to support the jury's finding that the murder was committed willfully, deliberately, and with premeditation. For the purposes of this argument, defendant does not dispute that Yoon was killed in the couple's home or that he had some role in Yoon's death. Rather, he contends that

23

insufficient evidence was presented to support the premeditation allegation, and thus he should be found guilty of second degree murder.

"First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166, superseded by statute on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959 & fn. 3.)

" ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*).) In other words, "the intent to kill must be formed upon a preexisting reflection and have been the subject of actual deliberation or forethought. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.) " ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' [Citations.]" (*Solomon*, *supra*, at p. 812.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court identified three factors typically present in cases of premeditated murder: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the

24

result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27.) The court has subsequently cautioned, however, that " ' "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]" ' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) Phrased differently, the *Anderson* factors do not impose "a straightjacket on the manner in which premeditation can be proven adequately at trial. [Citations.]" (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

In determining a sufficiency of the evidence claim, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "The role of an appellate court in reviewing the sufficiency of the evidence is limited." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)

## 2. Analysis

Considering the record as a whole in the light most favorable to the judgment, we find that there is sufficient evidence for a reasonable jury to conclude that defendant killed Yoon willfully, deliberately, and with premeditation.

The evidence established that Yoon died as the result of a particularly gruesome and sustained beating inflicted with a cylindrical weapon such as a pole or a bat. Yoon's death was not the result of an isolated blow or two. The forensic examiner determined that Yoon sustained a minimum of nine different impacts causing 29 distinct injuries. Some of the injuries indicated that they were sustained while Yoon attempted to defend herself. The injuries covered several areas of Yoon's body, including a large bruise on her face, a "massive" hemorrhage in the left frontal area of her head, several lacerations and rib fractures, and three skull fractures including one that indicated "significant force." The jury could reasonably conclude that the repeated, violent attacks necessary to cause these injuries represented a preexisting reflection on defendant's part, even if the reflection was formed quickly.

Yoon's death also followed a marriage that defendant admitted was troubled, turbulence that was elevated as a result of Choi's April 2017 visit. The couple's elder daughter had previously witnessed defendant hitting Yoon, and Yoon told her daughter that during Choi's April visit, Yoon and Choi got into a physical confrontation. Ultimately, Yoon called 911 during the April visit, requesting assistance in removing Choi from the house. Yoon told her daughter that both Choi and defendant were verbally abusive toward her, and that defendant was verbally and physically abusive toward Yoon during the visit. The couple's daughters also suspected that defendant was unfaithful to Yoon, a suspicion later proved correct. Defendant told sheriff's officials that he and Yoon had argued just one day before the killing over the way Yoon prepared defendant's breakfast, and he volunteered to sheriff's deputies that Yoon was "not happy" over the fact that defendant had wired $150,000 to South Korea without Yoon's knowledge.

26

Yoon had discussed divorce and had met with a divorce lawyer, and defendant was opposed to the idea of divorce, considering it to represent a "failure." This contentious marriage provided another basis for the jury to reasonably conclude that the killing was willful, deliberate, and premeditated, particularly when it occurred the same night Choi arrived and defendant told sheriff's deputies that Yoon was unhappy about Choi's arrival.

Additional evidence provides further support for the jury's verdict. Defendant told sheriff's deputies that he had been planning an unpaid leave of absence for two to three weeks before the interview that took place just days after the killing, demonstrating that he expected well before the killing to be needed to cover for Yoon at the laundromat for an extended period. In addition, the fact that defendant met Choi at the airport indicates that he planned Choi's visit for at least some time before the killing. Given that Choi and defendant had been sexually intimate, the jury could reasonably conclude that defendant planned Yoon's death to coincide with Choi's visit in order to remove an obstacle to his relationship with Choi. Furthermore, defendant, with Choi's assistance in some aspects, took several calculated steps soon after the killing to cover up the crime, including disposing of Yoon's cell phone, removing carpet, cleaning the scene with bleach, burning something in the trough and in a blue recycling can, creating a false story about Yoon's whereabouts and communicating the story to defendant's daughters, lying to law enforcement about Yoon's whereabouts, and disposing of Yoon's body in a remote location. The jury could reasonably conclude that these actions were more consistent with a premeditated killing than an unconsidered or rash one.

Thus, utilizing the three-part test of *Anderson* and mindful that the *Anderson* test serves merely as a guide to our analysis, substantial evidence existed to support the jury's verdict. Defendant's pre-scheduled leave of absence from his workplace provides evidence of planning activity prior to the killing, and the jury could also consider his actions in facilitating Choi's visit to be evidence of planning activity, considering that Yoon's death took place the night of Choi's arrival. Defendant's relationship with Choi

27

provided a motive to kill Yoon, particularly considering that Choi's earlier visit prompted Yoon to take steps toward divorce and resulted in 911 calls and a physical confrontation between Choi and Yoon. By his own admission, defendant's relationship with Yoon was difficult, and the couple's elder daughter testified that she saw defendant hit Yoon in the past. The couple had also differed over finances, with defendant sending $150,000 to South Korea without Yoon's knowledge, causing further discord. Thus, defendant's prior relationship and conduct with Yoon demonstrates a motive for him to kill her. Finally, the manner of the killing supports the jury's verdict, as the autopsy revealed that Yoon sustained multiple, serious injuries to various parts of her body, including injuries sustained trying to defend herself from the blows inflicted from a cylindrical object. The repeated, violent beating provided a basis for the jury to infer that defendant had a preconceived design to kill.

In support of their positions, the parties cite to various cases in which appellate courts have or have not found the evidence sufficient to demonstrate a killing was willful, deliberate, and premeditated. While each case stands on its own unique facts and our decision is based on the facts of this particular matter, other decisions support our conclusion that the jury's verdict was based on sufficient evidence. In particular, in *People v. Williams* (2018) 23 Cal.App.5th 396 (*Williams*), the court upheld a first degree murder conviction on facts relatively similar to the instant case. In *Williams*, the defendant stabbed his wife twice in the neck with a writing pen, causing her death. (*Id.* at p. 401.) The victim also suffered "a defensive cut on her left thumb and fresh blunt force injuries on her head, neck, torso, and extremities." (*Ibid.*) The reviewing court found the verdict to be supported, primarily based on motive evidence (the defendant's "rage at the collapse of the marriage") and "evidence of the intentional and deliberate manner of killing: two neck stabs, with an implied interval to reflect, as well as the infliction of blunt force trauma in different areas of the victim's body." (*Id.* at p. 410.) The court concluded: "The jury *could* have reasonably found that the victim's injuries reflected an

28

emotional, beserk attack, as suggested by defendant's briefing. But it was permitted to find otherwise." (*Ibid.*) The court also found that the defendant's "postkilling conduct" in attempting to elude authorities, combined with "the implication from the People's case-in-chief that defendant did nothing to help the victim after he stabbed her, speaks volumes as to his mental state." (*Id.* at p. 411.)

Again, we acknowledge that the facts of any two cases are necessarily distinguishable; for example, in *Williams*, the defendant testified and admitted that the second stabbing was done to " 'get the job done.' " (*Williams*, *supra*, 23 Cal.App.5th at p. 404.) However, the instant case, like *Williams*, presents a victim who suffered more than one injury, a defendant whose postkilling conduct evinced premeditated killing, and a defendant who did nothing to help the victim after inflicting the lethal attack. Additionally, the instant case includes facts indicative of first degree murder that *Williams* does not. Here, for example, the jury was presented with evidence of defendant's paramour arriving the day of the killing, prior turbulence caused by Choi's earlier visit, significantly more injuries, defendant's planned absence from work, and a history of difficulties in the marriage. *Williams* supports our independent conclusion that the jury possessed substantial evidence to support its verdict that the murder was committed willfully, deliberately, and with premeditation.

Defendant argues that the prosecution presented no substantial evidence of planning activity, as the bat that the defense asserted was the killing weapon was procured from defendant's close proximity when the beating occurred. Defendant also asserts that the second *Anderson* factor, motive evidence, supports overturning the jury's verdict because the evidence that defendant had a financial motive to kill his wife to avoid splitting their assets in divorce was weak. Finally, defendant asserts that the nature of the killing shows " 'an explosion of violence' " rather than a deliberate manner of killing. (*Anderson*, *supra*, 70 Cal.2d at p. 28.) Defendant's arguments are not persuasive. While defendant frames one way of analyzing the evidence, the jury

obviously adopted a different framework, one supported by substantial evidence. The prosecution introduced at least some evidence of planning activity in the form of Choi's visit and defendant's pre-planned leave of absence from work. While financial reasons may or may not have supplied defendant's motive to kill his wife, the prosecution did introduce evidence that defendant knew his wife had considered divorce and that defendant was opposed to divorce. The jury could certainly conclude that financial incentives inherent in divorce proceedings or a general desire to avoid the "failure" of divorce, combined with defendant's desire to be with his paramour and to be rid of his wife with whom he did not get along, provided a motive for him to kill his wife. Finally, while the forensic pathologist did not state exactly how long the beating continued for, the repeated nature of the blows (including blows inflicted after Yoon tried in vain to defend herself) certainly provided the jury a basis to conclude that defendant acted in a willful, deliberate, and premeditated manner.

While the prosecution introduced no direct evidence of a communicated, advance plan to kill Yoon, no such evidence is required, and the jury possessed substantial evidence to support its verdict. " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290, fn. omitted.) Here, numerous facts including the manner of killing, the extended disagreement between defendant and Yoon, defendant's relationship with Choi, the timing of the killing coinciding with Choi's arrival, defendant's coordinated leave of absence, and defendant's postkilling conduct provided the jury a basis to reasonably conclude that defendant committed first degree murder.

### B. *Ineffective Assistance of Counsel*

Defendant contends that he received ineffective assistance of counsel in four respects. First, he alleges that his trial counsel was ineffective by failing to move for an

acquittal under section 1118.1 at the end of the prosecution's case. Second, he alleges that his trial counsel was ineffective by promising the jury in his opening statement that Choi would admit to killing Yoon, and then when defendant's trial counsel did not get the hoped-for admission from Choi, defendant's trial counsel compounded the issue by telling the jury in his closing argument that Choi had, in fact, admitted to killing Yoon. Third, defendant alleges his trial counsel was ineffective in eliciting evidence in the defense's case that increased the likelihood of defendant being convicted, specifically by calling Choi to testify and by eliciting testimony that defendant led sheriff's officials to the location of Yoon's body. Finally, defendant alleges his trial counsel was ineffective for failing to object to the prosecution's introduction of evidence of the condoms removed from the freezer in defendant's house.

To prevail on an ineffective assistance of counsel claim, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) " 'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.]' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

When a claim of ineffective assistance of counsel is made on direct appeal, reversal is warranted only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*); see also *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*) ["a reviewing court will reverse a conviction

based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission"].)  On appeal, "we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.]" (*Mickel*, *supra*, at p. 198.)

Regarding prejudice, a "defendant must show that there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)  Prejudice requires a showing of a " ' "demonstrable reality," not simply speculation.' [Citations.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

A reviewing court is not necessarily required to address both components of an ineffective assistance claim. (*Strickland*, *supra*, 466 U.S. at p. 697.)  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Ibid.*)

### 1. Motion for Acquittal

Defendant alleges that his trial defense counsel was ineffective for failing to move for an acquittal under section 1118.1 at the close of the prosecution's case-in-chief. While defendant relies upon the same arguments for this allegation as in the sufficiency of the evidence issue he raises above, he asserts that the "overwhelming majority" of the evidence that defendant committed the murder in a willful, deliberate, and premeditated manner came from the defense's case, not the prosecution's case, and that the "same is true of the culprit's identity more generally."  Defendant argues that the prosecution's case revealed "practically no evidence" of who committed the killing, other than DNA consistent with defendant on a pair of glasses, the defense cross-examination of Keylon that revealed that defendant took sheriff's officials to Yoon's body, and defendant's false statements to his daughters and to sheriff's officials about Yoon's whereabouts.

Additionally, defendant argues that the "most damaging aspect of trial counsel's failure to bring a section 1118.1 motion is that there was insufficient evidence presented in the People's case to show that the murder was committed with premeditation and deliberation." Defendant asserts that at the close of the prosecution's case, the primary evidence showing the killer acted with premeditation and deliberation was Yoon's broken phone, defendant's planned leave of absence, and the nature of Yoon's injuries, all of which defendant argues added little to show that the killing was planned. Rather, defendant asserts, the primary evidence of premeditation and deliberation came from the defense's case, and thus defense counsel should have moved for an acquittal at the close of the prosecution's case-in-chief.

Defendant also asserts that there could be no conceivable rational tactical justification for failing to bring a motion for an acquittal, as the motion had potential merit and "there was just no conceivable downside" to doing so. In addition, defendant argues that he was prejudiced by the failure to bring the motion because "there was scant evidence of premeditation, let alone identity as to a murder charge altogether," and thus it was reasonably probable that the motion would have been granted. Defendant also asserts that even if the trial court would have denied the section 1118.1 motion, the issue would have been preserved for appeal had counsel brough the motion.

Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right." Motions for acquittal under this section are reserved for " 'those few

instances in which the prosecution fails to make even a prima facie case.' [Citations.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200 (*Stevens*).)

"In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same. [Citation.] ' "[W]e do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' [Citations.] Notably, however, '[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point.' [Citations.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1182-1183 (*Hajek and Vo*), disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Here, we have found that the prosecution introduced substantial evidence to support a verdict of guilty to first degree murder. Thus, defense counsel's failure to bring a motion for acquittal did not prejudice defendant. This is simply not one of " 'those few instances in which the prosecution fails to make even a prima facie case.' [Citations.]" (*Stevens*, *supra*, 41 Cal.4th at p. 200.) As discussed above, the prosecution put forward substantial evidence that defendant acted with the requisite intent in killing Yoon, and thus defendant cannot show that there was a reasonable probability that the trial court would have granted such a motion. Additionally, defendant's argument that the

34

prosecution did not introduce substantial evidence in its case-in-chief as to the identity of the killer is unpersuasive. The evidence clearly showed that Yoon died in the house at the hands of one of two people, defendant or Choi, or through the actions of both of them. Defendant's presence, his motive, and his actions in covering up the killing certainly provided a prima facie case that defendant committed the murder.

Defendant argues that he was prejudiced by the failure to move for an acquittal because, even if the trial court would have denied the motion, he lost the opportunity to argue on appeal that such a denial was an error. But this argument is little different than defendant's first issue concerning the sufficiency of the evidence. Either way, the trial court was presented with substantial evidence that defendant acted willfully, deliberately, and with premeditation to warrant denying a motion for an acquittal and allowing the jury to render a verdict. Defendant also argues that he was prejudiced because evidence that could have been used to support the jury's verdict came from the defense's case. We find this argument unconvincing. As we discuss below, we see no ineffective assistance of counsel in the decision to explore topics with Choi and Taylor in the defense's case, but regardless of how the jury viewed and used evidence in the defense case, the prosecution's case standing alone supplied sufficient evidence of premeditation to make out a prima facie case of first degree murder. Our analysis in the first issue above concerning defendant's claim that the verdict was not supported by substantial evidence is based solely on evidence in the prosecution's case, with no reference to testimony from Choi or Taylor in the defense's case. The prosecution's evidence standing alone is sufficient to uphold the jury's verdict, and thus there would be no basis for the trial court to grant a motion to acquit. (See *Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1182-1183.)

### 2. Opening Statement and Closing Argument

Defendant asserts that his counsel's comments in his opening statement that Choi would admit to killing Yoon constituted ineffective assistance. Defendant argues that counsel was ineffective in "promising that Choi would admit to Yoon's killing, despite

35

knowing in advance that Choi's plea to voluntary manslaughter was expressly made under *People v. West* . . . where a reasonably competent attorney would know that [the plea] is akin to denying the act of killing, but agreeing to some culpability in exchange for a reduced sentence." Defendant then argues that after Choi failed to admit to the killing in her testimony, his counsel was further ineffective by "gaslight[ing] the jury in closing argument by telling them the defense had 'fulfilled that promise' of testimony when nothing could have been further from the truth: in her testimony, Choi directly implicated [defendant] in Yoon's beating death." We find that defense counsel's statements in his opening statement and closing argument do not constitute ineffective assistance of counsel.

"Making promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885 (*Burnett*).) Most of the decisions that address whether counsel was ineffective in failing to live up to promised evidence in an opening statement come in the context of counsel's having made a conscious decision not to present the promised evidence because of subsequent developments. Thus, in *Burnett*, the court held that defense counsel was not ineffective in advising the defendant not to testify despite a promise in the opening statement that the defendant would testify, because developments in trial revealed the defendant's testimony would not be credible. (*Ibid.*) "Whether the failure to produce a promised witness amounts to ineffective assistance of counsel is a fact-based determination that must be assessed on a case-by-case basis. [Citation.] Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case. [Citations.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 955.) For example, in *People v. Frye* (1998) 18 Cal.4th 894 (*Frye*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, the defendant argued that his counsel was "ineffective for failing to deliver on two promises made to the jury during the opening statement," one

36

being that the defendant would testify and the other that medical professionals would testify as to impairments the defendant suffered. (*Frye*, *supra*, at p. 983.) The Supreme Court found the defendant did not demonstrate ineffective assistance of counsel, characterizing defense counsel's advice to the defendant not to testify (and the associated lack of need for the medical professionals' testimony) as "appropriate tactical decisions, subject to great deference on appellate review. [Citation.]" (*Id.* at p. 984.)

Here, defendant's situation is different in some respects from a scenario in which defense counsel promises the jury the defendant will testify, but then later advises the defendant not to do so due to changed circumstances. Defense counsel here did not promise that defendant would testify, but instead told the jury defense counsel was "confident" that Choi would admit to killing Yoon, and that the jury would "unequivocally" find that Choi admitted to killing Yoon. Nonetheless, we conclude that defendant has failed to show there could be no rational tactical purpose or satisfactory explanation for defense counsel's statement in his opening and closing, given his apparent decision to portray Choi, not defendant, as the person who killed Yoon. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

Defendant's counsel filed a pretrial motion that sought to publish the content of Choi's no contest plea and her statements in connection with her plea to the jury in the defense's opening statement in defendant's case. The trial court took up this motion in a pretrial session. The defense asserted that it wanted "to call [Choi] to the stand and cross-examine her on her entering a plea of no contest." The prosecutor responded by asserting that Choi's plea was hearsay, and that the no contest plea did not constitute an admission that Choi killed Yoon.

The trial court initially indicated that Choi's plea constituted hearsay, and that Choi's plea did not necessarily constitute an admission that she killed Yoon, observing that "[i]t's a well-known fact that people will enter a reduced plea to avoid the possible more penal circumstances of being found guilty at a murder trial," and that Choi "may

well have had those reasons to accept the plea." The trial court stated that if Choi chose to testify, that would not present an issue, but if Choi did not testify, merely introducing evidence of Choi's plea "has a very strong chance of misleading the jury. They're going to want to know really what the impact is. You're going to argue it's one thing, and then that opens up the possibility of having another argument as to why people do this. And, of course, there's no evidence as to that. The jury would be left in a quandary as to what type of way to get to that sort of a plea." The defense responded that a no contest plea is treated like an admission of guilt, that both Choi and the prosecution in her case stipulated to a factual basis behind the plea, and that Choi's admission to killing Yoon was "100 percent relevant" to the defense's case. After further discussion, the trial court ruled that defense counsel could not introduce evidence of Choi's plea if Choi was not going to testify. However, the trial court instructed that defense counsel could tell the jury in the defense's opening statement "that there will be evidence that Ms. Choi is the one who actually committed the homicide."

On the first day of trial, defense counsel re-raised the issue of informing the jury about Choi's no contest plea, suggesting that the court conduct a hearing under Evidence Code section 402 to determine whether Choi would exercise her Fifth Amendment right against self-incrimination or whether she would testify in defendant's trial. The trial court agreed to the hearing, though the court stated that it "assume[d]" Choi would invoke her Fifth Amendment right, and the court "very much question[ed] the relevance" of evidence of her plea. The court conducted the hearing the next day. Choi's attorney was present during this session, and he advised Choi that she had the right not to testify in defendant's case. Defense counsel attempted to question Choi about her plea, but the trial court redirected the proceedings, stating that the focus of the hearing was to determine whether Choi would testify, not to elicit testimony about her no contest plea. The court then asked Choi if she would answer questions in front of the jury "about the events that led to the death of [Yoon]. . . ." Choi responded affirmatively. After

38

subsequent discussion, the court noted that Choi's statement that she would testify "comes certainly as a surprise." The court then noted that if it permitted defense counsel to allude to Choi's expected testimony in opening statement, it ran the risk that Choi might change her mind.

After considering the matter, the trial court decided Choi needed to be questioned further to ensure she would testify at trial. The court determined that the defense could not introduce Choi's plea itself, but that the defense could call Choi to testify about the involvement she and defendant had in Yoon's death. Choi then testified in a hearing again. Choi's attorney was present once again, and he informed the court that Choi was willing to testify. The trial court informed Choi that "[w]e're not interested in [your no contest plea] in this case. So I'm not asking about anything about your plea of no contest. And if you testify at the trial, that will not be the questions that you're being asked." Instead, the court notified Choi that if she testified, her testimony would cover "what was seen or heard or anything of that nature, about [defendant's] involvement in the death of his wife . . . ." The court told Choi that she could also be asked questions about her own involvement in Yoon's death. Choi agreed to answer such questions.

Following this, the defense renewed its request to be permitted to tell the jury in opening statement that Choi admitted to killing Yoon. The trial court denied this request, stating that defense counsel could tell the jury what he expected Choi to testify to. The court also stated that "[t]he whole issue of her entering a no contest is irrelevant," though Choi's plea "may become relevant during her testimony if she surprises you with answers." Further discussion ensued about whether defense counsel could tell the jury that Choi "admitted" to killing Yoon, but the trial court clarified that defense counsel could not "get in the back door of her no contest plea." Instead, the trial court told defense counsel, "If you understand that [Choi] is going to testify that she killed Mrs. Ji, you can tell the jury that that's what you expect her to testify to." After further discussion on the topic, the trial court again told defense counsel that he could tell the

39

jury the substance of Choi's expected testimony, including that Choi was involved in the killing in some way, if he had "some good-faith belief that that's what she will say." Soon after that, discussion on this topic concluded. Ultimately, therefore, the trial court left it up to defense counsel what to say in his opening statement, based on what he expected Choi to testify to.

Defense counsel's statements were clearly driven by a tactical decision to use Choi's no contest plea to assert that she, not defendant, killed Yoon. Regardless of whether it is technically accurate that Choi's prior no contest plea to voluntary manslaughter is tantamount to "admitting" killing Yoon, the jury could reasonably believe that Choi's plea amounted to an admission of some sort. By placing Choi on the stand and obtaining her admission that she pleaded no contest to voluntary manslaughter in Yoon's death, defense counsel was able to assert that Choi's plea constituted an admission, as defense counsel had promised in his opening statement. Indeed, Choi testified not only that she pleaded no contest but that she did so because she "was only trying to not receive any additional sentencing" and because she "felt that there was a possibility of me having some responsibility of Mrs. Ji's death," indicating that she believed that there was a possibility she could be convicted of a more serious crime (i.e., first or second degree murder) for Yoon's death. Thus, defense counsel was able to argue in closing that Choi's no contest plea amounted to an admission because Choi did not want to be convicted of murder.

As defendant notes, Choi denied on the stand that she killed Yoon, and Choi characterized her plea as something less than an admission to killing Yoon. Defendant asserts that because Choi's plea was entered pursuant to *People v. West* (1970) 3 Cal.3d 595 (*West*), it did not constitute an "admission" of guilt, arguing that "a reasonably competent attorney would know that [the plea] is akin to denying the act of the killing, but agreeing to some culpability in exchange for a reduced sentence." The Attorney General counters that even though Choi's plea was entered pursuant to *West*, it

nonetheless constituted an admission to the voluntary manslaughter of Yoon, and thus by obtaining Choi's testimony about her no contest plea, defense counsel did obtain an admission from Choi that she killed Yoon.

In *West*, the court held that a guilty plea or a no contest plea is not made involuntary simply because the plea comes as the result of a plea bargain between defendant and the prosecution. (*West*, *supra*, 3 Cal.3d at p. 608.) The court in *West* stated: "A defendant who knowingly and voluntarily pleads guilty or nolo contendere can hardly claim that he [or she] is unaware that he [or she] might be convicted of the offense to which he [or she] pleads; his [or her] plea demonstrates that he [or she] not only knows of the violation but is also prepared to admit each of its elements. [Citation.]" (*Id.* at p. 612.) When a defendant pleads no contest, or nolo contendere, the court is required to "ascertain whether the defendant completely understands that a plea of nolo contendere shall be considered the same as a plea of guilty and that, upon a plea of nolo contendere, the court shall find the defendant guilty." (§ 1016, subd. (3).) " 'A plea of guilty admits every element of the offense charged . . . , all allegations and factors compromising the charge contained in the pleading . . . .' [Citation.] The legal effect of a no contest plea is the same. [Citation.]" (*People v. Palacios* (1997) 56 Cal.App.4th 252, 257-258.) Defense counsel knew that Choi pleaded no contest to voluntary manslaughter in connection with Yoon's killing, and thus he had some good-faith basis for concluding that he could elicit from Choi in some sense that she "admitted" to killing Yoon.

We also note that defense counsel's motion in limine on this matter attached a transcript of Choi's plea in which Choi's attorney stated that the factual basis for Choi's plea "would be based on the preliminary hearing transcript, the police reports on file, and other statements to be given to the Court," and Choi's attorney later similarly agreed with the prosecution that the preliminary hearing transcript in Choi's case provided a factual basis for the no contest plea. Nowhere in the transcript of Choi's no contest plea did she

deny killing Yoon, with her counsel merely stating that she was entering the plea "to avoid a worse punishment." The trial court in Choi's case also advised Choi that her plea "would have the same effect as a plea of guilty," and that the court "will treat it just as if you pled guilty and you will be found guilty."

Thus, defense counsel had some reason to believe that Choi would "admit" to killing Yoon, whether outright or by admitting to her no contest plea. When Choi confirmed her no contest plea on the stand, defense counsel had a basis to follow through with his position that a no contest plea equated to an admission, and to argue in closing that he fulfilled the promise that Choi would admit to the killing. The jury received no instruction either way as to the legal effect of a no contest plea, meaning defense counsel was free to assert, as section 1016 indicates, that Choi's no contest plea has the same legal effect as a plea of guilty. Thus, trial counsel's closing argument invited the jury to conclude that Choi had, at least in a sense, admitted to the voluntary manslaughter of Yoon. The jury apparently ultimately concluded that Choi's no contest plea did not rule out defendant as the perpetrator of Yoon's killing. However, this does not mean that defense counsel's strategy was objectively unreasonable, and given the factual scenario of Yoon's killing, attempting to assign responsibility for Yoon's death on Choi was defense counsel's most logical strategy. We conclude that defendant has failed to show that defense counsel had no rational tactical purpose for his statements or that there could be no satisfactory explanation for his statements in light of the evidence arrayed against defendant. We thus reject defendant's claim because he has not demonstrated any deficient performance by his defense counsel. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

We also disagree with defendant's characterization of defense counsel's closing argument as "gaslight[ing]" the jury. Defense counsel did not attempt to manipulate the jury into questioning its own perception of what had occurred in Choi's testimony; he merely argued that he "fulfilled" his earlier promise to the jury that Choi would admit to killing Yoon, noting Choi's no contest plea to the voluntary manslaughter of Yoon.

42

Defense counsel thus characterized Choi's testimony in a way believed to be to defendant's advantage and consistent with the defense's theory of the case. Even though Choi denied actually killing Yoon on the stand, the jury was free to draw its own conclusion as to whether Choi had, in fact, admitted to killing Yoon through Choi's no contest plea, thereby fulfilling the promise defense counsel made in opening statement. "Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.) "The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript . . . ." (*People v. Cudjo* (1993) 6 Cal.4th 585, 634.) If defense counsel erred in his closing argument, it was in attempting to portray the evidence in the best light possible to defendant. We decline to find deficient performance in this situation.

Even assuming that defense counsel's actions were objectively unreasonable, however, we find that there is no reasonable probability that counsel's statements in opening and closing affected the outcome. Defendant speculates that the jury would have been turned against him by defense counsel characterizing Choi's testimony in this way, but we see no reason to believe this would be a reasonably probable outcome. As the jury was instructed, opening statements and closing arguments are not evidence. "Jurors are presumed to understand and follow the court's instructions. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 662.) The jury received no instruction as to what the legal effect of a no contest plea is, but even if they believed that Choi's no contest plea did not constitute an "admission," we see no reason why the jury would be prejudiced against defendant by defense counsel's statements to the contrary. Ample evidence supported defendant's conviction, as the evidence left little doubt that Yoon died in defendant's home, and either defendant or Choi committed the killing. The prosecution's case attempted to assign responsibility for the killing to defendant, and the defense's case

attempted to blame Choi. Defense counsel's statements in opening and closing were part of a strategy to assign blame to Choi that pervaded the trial, and the jury would likely see the statements in that light. Ultimately, the jury believed the prosecution's theory to be credible, not the defense's theory. If defense counsel had not promised the jury that Choi would admit to the killing, and if defense counsel had not then told the jury in closing that counsel had fulfilled the promise, the evidence would have been exactly the same, and the jury would have been left to draw its own conclusions about the impact of Choi's no contest plea instead of having defense counsel's perspective as to what the plea meant. In this situation, there is no basis to believe that defense counsel's statements would be the lynchpin of the jury's finding when the statements merely reflected the defense strategy of assigning blame to Choi.

### 3. Evidence in Defense Case

Defendant next argues that his counsel increased his chance of conviction in the defense's case through testimony of Choi and Taylor, and thus defense counsel was ineffective. Defendant raises issue with two actions of his counsel during the defense case: first, calling Choi to the stand without having interviewed her in advance; and second, adducing evidence from Taylor that defendant led sheriff's officials to Yoon's body. We do not agree that counsel was ineffective in these regards.

Even assuming that defense counsel called Choi without interviewing her in advance, we find that counsel's actions do not rise to the level of ineffective assistance.[7] Defense counsel's actions indicate he anticipated Choi would try to place blame on defendant for Yoon's killing, and he was able to confront inconsistencies in Choi's answers. For example, as discussed above, when Choi denied having admitted that she killed Yoon, defense counsel was able to elicit testimony confirming that Choi pleaded no contest to voluntary manslaughter in Yoon's death. Defense counsel obtained Choi's

---

[7] Defense counsel did not state on the record whether he interviewed Choi before her testimony.

44

acknowledgement of a sexual relationship between her and defendant, supporting the defense's argument that Choi killed Yoon to secure her relationship with defendant, and when Choi portrayed the intercourse with defendant as an alcohol-induced mistake and later as non-consensual, defense counsel confronted Choi with the evidence of not one but two condoms with evidence of defendant and Choi's DNA on them. When Choi stated that she assisted defendant in cleaning up evidence of the killing because she was afraid of defendant, defense counsel confronted Choi by asking why she did not seek help from law enforcement during the execution of the search warrant. Defense counsel also responded to Choi's general denial of an active role in the killing by confronting Choi with her statements to defendant in the patrol car that portrayed her as directing defendant how to respond to the investigation. Even if defense counsel did not interview Choi in advance given Choi's late, unexpected decision to testify, defense counsel was prepared to respond to Choi's statements.

In addition, defense counsel elicited several pieces of potentially helpful information from Choi. Choi admitted that she touched the bat that the defense asserted was the murder weapon, explaining why her DNA would be on the bat. Choi admitted to being home when Yoon died, and to knowing that Yoon was, in fact, dead, supplying the prime piece of direct evidence placing someone else besides defendant at the scene of the killing. Choi also testified that she actively participated in cleaning up the scene of the killing, using towels to clean up blood and then securing the towels in a plastic bag, and wrapping Yoon's body in a comforter, which the jury could view as indicative of Choi's consciousness of guilt. Choi also admitted that she went grocery shopping with a credit card belonging to Yoon just days after Yoon's death. Choi verified that she was photographed kissing defendant in April 2017, and that she knew for some time that defendant and Yoon's marriage "was not going well." Finally, defense counsel asked Choi how she felt about Yoon's death, and then defense counsel was able to argue in closing that Choi's answers demonstrated a lack of empathy and remorse that was

45

consistent with Choi being the cause of Yoon's death. All of this information supported the defense's theory that Choi, not defendant, was the person who killed Yoon.

As to the testimony that defense counsel elicited from Taylor about defendant telling sheriff's officials where Yoon's body was located, the record clearly indicates that defense counsel consciously chose to bring out this evidence in an effort to support the position that Choi was the killer and defendant was a bystander. Eliciting this information was plainly the defense's plan from the outset. In the defense's opening statement, counsel told the jury: "Now, the prosecution is right. They found -- they found the body of Mrs. Ji on the 20th. But that was after an interview by Captain Taylor of my client at the County Jail. [¶] He interviews my client, and based on that interview, they go to the place where the body was found." Then, during his cross-examination of Keylon during the prosecution's case-in-chief, defense counsel asked how Keylon knew where to go to locate the body. The prosecutor objected on hearsay grounds, but the trial court overruled the objection. Keylon then stated: "[Defendant] showed us. He took us out there."

Defendant complains about his counsel's questions of Taylor during the defense case, but these questions were consistent with defense counsel's approach throughout the trial, and Taylor's testimony during the defense case actually provided less information about defendant's role in the discovery of Yoon's body than Keylon's earlier testimony during the prosecutor's case-in-chief did. On direct during the defense case, defense counsel asked Taylor if he met with defendant on December 20, 2017, and Taylor replied affirmatively. Defense counsel then asked, "And after the interview, did you go to the place where the body of Yoon Ji was located?" Taylor again replied in the affirmative. After that, defense counsel asked, "Was that the product of your interview?" The prosecutor objected on hearsay grounds, and the court sustained the objection. Defense counsel argued that the question did not call for hearsay, but the court reiterated its ruling. Thus, Taylor never testified that defendant led law enforcement officials to

46

Yoon's body, merely stating that "[t]here was a sequence of events that led up to" finding Yoon's body.

To the extent that defendant's argument on this issue focuses on defense counsel's cross-examination of Keylon in addition to Taylor's testimony, defense counsel's obvious approach was to introduce evidence that defendant led sheriff's officials to the body in an attempt to portray Choi as the killer and himself as an aggrieved bystander. Defendant's act of leading sheriff's officials to the body does not automatically equate to an admission that he killed Yoon. Instead, the jury might reasonably infer that if defendant had been the killer, he would be less likely to implicate himself by leading sheriff's officials to Yoon's body, whereas if Choi had killed Yoon, defendant would be more likely to cooperate in uncovering the whereabouts of the body. As with Choi, defense counsel was also able to elicit several potentially helpful pieces of information to the defense from Taylor, including Choi's response to Taylor about why her DNA might be on the bat, the fact that Taylor considered Choi a suspect when he asked her about the bat, the fact that Taylor saw Choi standing near where Yoon was presumed to have died cleaning the area with bleach, and the lack of DNA evidence recovered from the objects in the backyard.

Defense counsel had apparent tactical reasons to elicit the testimony that he did from both Choi and Taylor, and defense counsel was able to draw out several points that either outright helped the defense, or at least could be viewed by the jury as consistent with the defense's theory of the case. We give counsel's tactical decisions great deference, and we conclude that there are satisfactory explanations for why defense counsel presented Choi and Taylor as witnesses in the defense's case. We thus reject defendant's claim because he has not demonstrated any deficient performance by his defense counsel.

47

### 4. Condom Evidence

Defendant concludes his ineffective assistance contentions by asserting that his counsel was ineffective for failing to object to the introduction of the evidence concerning the used condoms taken from a freezer in defendant's home. He argues that this evidence should have been excluded under Evidence Code section 352 because any probative value in confirming the sexual relationship between defendant and Choi was substantially outweighed by the evidence's prejudicial impact. Defendant asserts that this prejudicial impact comes in two forms. First, he states that the evidence would cause the jury to wonder why anyone would retain used condoms in a freezer. Second, he asserts that "[e]vidence that [defendant] had sexual relations at least once with his cousin suggests morally questionable behavior at best." Thus, he argues that an objection would have resulted in the evidence's exclusion, or at least a limiting instruction, and that he was prejudiced because "the condom evidence painted a very negative picture of [defendant] as a man who was cheating on his wife and keeping the physical evidence of sexual intercourse in the freezer of the house he shared with Yoon."

Defendant's contention that the evidence would have been excluded under Evidence Code section 352 is not convincing, given the obvious importance of the relationship between defendant and Choi in helping to determine who had a motive to kill Yoon. Defendant's prejudice contentions are also mitigated by the fact that no evidence indicated that it was defendant who kept the condoms in the freezer. In fact, the jury could conclude that Yoon might be more likely to retain this evidence as part of her contemplated divorce proceedings. Additionally, some evidence cast doubt as to whether Choi was, in fact, defendant's cousin, meaning the jury might not be convinced that defendant had engaged in sexual relations with a relative. Regardless of whether the objection would have been successful, however, defendant's failure to object does not equate to ineffective assistance of counsel because the defense counsel made the relationship between Choi and defendant a focus of the defense's theory that Choi killed

Yoon. Thus, the failure to object was plainly a tactical decision by counsel, entitled to deference on appeal.

"Failure to object rarely constitutes constitutionally ineffective legal representation . . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citations.]" (*Lopez*, *supra*, 42 Cal.4th at p. 972.)

This was not a case where defense counsel simply failed to object to potentially harmful evidence. Instead, the record indicates that defense counsel wanted this evidence to be presented to the jury. The defense made the relationship between defendant and Choi a central part of its case, portraying Choi as killing Yoon to achieve her desire of furthering a relationship with defendant. In opening, defense counsel specifically referred to Choi as defendant's "girlfriend" seven times, arguing that Choi, "the girlfriend, did the killing." In opening, defense counsel specifically linked Choi's relationship with defendant to Choi's no contest plea, asserting that as defendant's "girlfriend," Choi killed Yoon in the heat of passion, in a sudden quarrel.

Defense counsel continued this approach of highlighting the relationship between Choi and defendant throughout trial. Defense counsel cross-examined defendant's and Yoon's daughter about her parents' marriage, eliciting testimony that Yoon had contacted a divorce attorney and that the marital problems grew worse in light of Choi's April 2017 visit, when Yoon and Choi got into a physical confrontation. As discussed above, defense counsel used the condom evidence to confront Choi when she asserted that the sexual intercourse occurred one time and was a mistake or non-consensual. In closing argument, defense counsel discussed the condom evidence and the sexual relationship between Choi and defendant in arguing both that Choi was not honest in her testimony and that Choi had a motive to kill Yoon.

Defense counsel used the condom evidence, and the overall evidence of a romantic or sexual relationship between Choi and defendant, to assert that Choi had a

49

motive to kill Yoon to remove an obstacle preventing Choi from further pursuing the relationship. While the jury ultimately did not accept the defense's theory that defendant was a bystander while Choi killed Yoon, we cannot say that the defense's tactics were unreasonable, particularly given the fact that the evidence clearly indicated that either defendant or Choi killed Yoon. In this scenario, using the condom evidence to assert that Choi was the killer was a tactical decision by defense counsel, entitled to deference on appeal. (*Mickel*, *supra*, 2 Cal.5th at p. 198.)

### C.     *Jury Instructions – Duty to Aid*

Defendant asserts that the trial court violated his constitutional rights by instructing the jury that a finding of murder could be based on his failure to perform a legal duty toward his spouse, when he asserts that no such duty exists under California law. We apply the de novo standard of review to a claim of erroneous jury instructions. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) " ' "[I]n reviewing an ambiguous instruction . . . , we inquire 'whether there is a reasonable likelihood that the jury applied the challenged instruction in a way' that violates the Constitution." ' [Citations.]" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 60.) " 'When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.]" (*Hajek and Vo*, *supra*, 58 Cal.4th at 1217.)

"When a trial court instructs the jury on alternative theories of guilt and at least one of those theories is legally erroneous at the time it was given, we normally assess whether the error was harmless beyond a reasonable doubt . . . . [Citation.] We 'must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt.' [Citation.]" (*People v. Gentile* (2020) 10 Cal.5th 830, 851

(*Gentile*), superseded by statute on other grounds as stated in *People v. Williams* (2022) 86 Cal.App.5th 1244, 1252.)

The Penal Code generally defines murder as the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "Under California law, the elements of murder—that the prosecution, by definition, is required to prove beyond a reasonable doubt—are as follows: (1) the defendant committed an act that caused the death of another person; (2) when the defendant acted, he had a state of mind called malice aforethought; and (3) he killed without lawful excuse or justification. [Citations.]" (*People v. Navarette* (2016) 4 Cal.App.5th 829, 843.) "The element of malice aforethought, moreover, encompasses two alternative mental states, express malice and implied malice, which must be formed before the act that causes death is committed. [Citation.] A defendant acted with express malice if he unlawfully intended to kill, and with implied malice if he (1) intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life. [Citation.]" (*Id.* at pp. 843-844.)

Failure to act can form the basis for a murder conviction if there is a special relationship between the defendant and the victim. (See *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 550 ["[P]etitioner suggests that a person can be found guilty of murder based on a failure to act only if there is 'a special relationship' between the person and the victim, which (in petitioner's view) was lacking here. We agree that this is the law, but we conclude that there was sufficient evidence of the necessary special relationship."].) "Unlike the imposition of criminal penalties for certain positive acts, which is based on the statutory proscription of such conduct, when an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action. [Citations.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 197-198.)

51

CALCRIM No. 520 generally provides instructions for first or second degree murder with malice aforethought, laying out the elements these two offenses contain. The instruction provides, in part, that the prosecution must prove that a defendant either committed an act that caused the death of another, or that the "defendant had a legal duty to (help/care for/rescue/warn/maintain the property of/ [another]" and "the defendant failed to perform that duty and that failure caused the death of" another. (CALCRIM No. 520.) The bench notes to CALCRIM No. 520 provide: "If the prosecution's theory of the case is that the defendant committed murder based on his or her failure to perform a legal duty," the court may instruct the jury concerning the failure to perform a legal duty, using the language quoted immediately above. (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 520.) The note then refers to the bench notes for CALCRIM No. 582, covering involuntary manslaughter based on a failure to perform a legal duty. The CALCRIM No. 582 notes provide: "The existence of a legal duty is a matter of law to be decided by the judge. [Citations.] The court should instruct the jury if a legal duty exists. [Citation.]" (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 582.)

Defendant asserts that the trial court's instruction in its modified version of CALCRIM No. 520 concerning failure to perform a legal duty, including its instruction that "[o]ne spouse has a legal duty to help and care for his other spouse," was erroneous because he "is unaware of any California case which has found that a defendant's failure to affirmatively prevent harm or seek aid for their spouse may give rise to first or second degree murder liability." He argues that a duty to act may be implied where there is a special relationship between people, such as in a parent-child or elder abuse scenario, but that "a spouse's mere failure to intervene to render care or help would not be grounds for liability unless the defendant did something to assume a caretaking role in caring for the spouse." Defendant thus asserts that the trial court's instructions outlined an

52

unauthorized theory of murder, and the error was not harmless beyond a reasonable doubt because the jury could have based its verdict on the failure to act theory.

Assuming without deciding that the trial court improperly instructed the jury that defendant owed a duty to help and care for his spouse and that he could be found guilty of first or second degree murder based on his failure to fulfill this duty, we find that any error was harmless beyond a reasonable doubt. The trial focused on three possible scenarios leading to Yoon's death. The prosecution outlined two of these scenarios in its closing argument: either Choi and defendant "worked together to murder Yoon" in that "[t]hey both were involved in everything that happened that night . . ." or defendant "did it by himself." The defense's theory posited a third scenario where Choi killed Yoon, as evidenced by her voluntary manslaughter no contest plea, and defendant's involvement was limited to merely not being honest after the fact. These were the three possibilities put to the jury.

The verdict plainly demonstrates that the jury rejected the third scenario put forth by the defense. By finding defendant guilty of first degree murder, the jury necessarily found that defendant acted in a willful, deliberate, and premeditated fashion. The jury could not have found defendant guilty of first degree murder if it accepted defense counsel's theory, because defendant could not have both acted willfully, with premeditation, and deliberately if defendant's only involvement was failing to help or care for Yoon while Choi bludgeoned Yoon to death. In other words, the jury rejected the defense's scenario in which Choi killed Yoon while defendant's role, in the words of defense counsel, merely involved "witnessing a murder" that Choi committed. Thus, the jury did not find defendant guilty of murder based solely on defendant's failure to intervene while Choi killed Yoon.

Defendant argues that the jury could have based its verdict on a failure to act/duty of care theory in either of the two scenarios offered by the prosecution. We disagree. The two scenarios the prosecution set forth both focused on defendant as an active

53

participant in killing Yoon, either by himself or working in concert with Choi. It is true that the prosecutor discussed defendant's failure to act (for example, defendant's failure to call 911 after the attack) as evidence of his depraved indifference toward Yoon. However, the prosecution made this argument in the context of arguing, as an alternative basis for criminal liability, that defendant acted with implied malice aforethought. In other words, the prosecution cited defendant's failure to act as an example of how defendant could be found liable for first or second degree murder generally; the prosecution did not argue that defendant could be found liable of first degree murder specifically based on a failure to act. Instead, the prosecution argued the opposite, stating merely that "you can also be guilty of a second-degree murder if you fail to act in the face of a legal duty." The prosecutor then explained how a person can fail to live up to a duty toward another, concluding: "So one way, as well that the defendant could be guilty of second-degree murder, although this is not with the express intent to kill part, but I do want to explain this so you understand why you have it. [¶] If he knew she was bleeding out and does nothing, and that act of doing nothing in the face of that legal duty was a depraved indifference. That is a second-degree murder. So that is another way to get to second-degree murder." Following an overruled objection from defense counsel to the prosecutor's argument that failure to act while his wife was dying could demonstrate a depraved indifference, the prosecutor stated again: "And so that would be a second-degree murder. That's one other way to get there. [¶] Now, if that indifference -- so that will be second-degree murder." The prosecutor never argued that the jury could find first degree murder based on a failure to act theory.

In this situation, the jury could not have found that defendant acted willfully, deliberately, and with premeditation based solely off his failure to intervene to help or care for Yoon, and thus any error was harmless beyond a reasonable doubt. Even the prosecution agreed that defendant could only be found guilty of, at most, second degree murder if defendant's culpability was based on his failure to act. The trial court

instructed the jury that it could find the elements of murder generally (i.e., causing the death of another) to be met based on a failure to act; it did not instruct the jury that it could take the extra step of finding that defendant acted willfully, deliberately, and with premeditation based solely on a failure to act. Instead, the jury was properly instructed that in order to find defendant guilty of first degree murder, the prosecution must demonstrate that defendant "acted willfully, deliberately, and with premeditation." The court's instructions concerning first degree murder, as opposed to murder generally, contained no language indicating that defendant could be found guilty of first degree murder based on a failure to act. In the factual scenario presented to the jury, the jury could not have found both that defendant acted willfully, deliberately, and with premeditation and yet that his involvement merely amounted to a failure to act.

Defendant cites the jury's question to the trial court about the difference between first degree and second degree murder as proof of confusion, arguing that the instructions could have impacted the jury's verdict. However, when the jury asked this question, the court once again repeated its instructions based on CALCRIM Nos. 520 and 521, including that to find defendant guilty of first degree murder, the jury had to find that defendant acted willfully, deliberately, and with premeditation. Nothing in the court's answer indicated that the jury could find defendant guilty of the specific offense of first degree murder based on a failure to act premise. Thus, the jury's question provides further evidence that the jury understood that it could not find defendant guilty of first degree murder based on defendant's failure to act. We therefore conclude beyond a reasonable doubt that any error in the court's instructions was harmless. (*Gentile*, *supra*, 10 Cal.5th at p. 851.)

### D. *Cumulative Error*

Defendant argues that the cumulative prejudicial effect of trial counsel's errors deprived him of a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is

reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

We have rejected each of defendant's claims of ineffective assistance of counsel. Thus, we reject defendant's cumulative error argument. (See *In re Reno* (2012) 55 Cal.4th 428, 483; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Regardless, "[w]e have considered each claim on the merits, and neither singly nor cumulatively do they establish prejudice requiring the reversal of the conviction[]." (*People v. Lucas* (1995) 12 Cal.4th 415, 476.)

## IV.    DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*People v. Ji*
**H048205**